DICKINSON, Justice,
Concurring in Part and Dissenting in Part.
¶ 24. The majority is quite correct, I believe, in holding that the chancellor did not err in finding Garland made a valid inter vivos gift of his horses. Therefore, I concur to that extent. However, it seems to me the chancellor erred in holding than Fred and his attorney violated the Litigation Accountability Act and M.R.C.P. 11, and in removing Fred as executor. Therefore, I respectfully dissent to that extent.
¶ 25. On April 16, 2002, Fred filed a Complaint to Probate the Last Will and Testament of his late brother, Garland. The Complaint stated in part:
Your Plaintiff shows further that the decedent, GARLAND LADNER, died possessed of certain real and personal property, some of which had been taken by other parties and at the present time is left 18 cows, 14 calves and a bull and 4 horses. The cows, calves and bull should be taken to the stockyard for disposal immediately. The cattle are presently located on LUTHER LAD-NER’S land, a brother of the decedent, and the court should direct that Luther Ladner release the animals to the Executor so they could be sold at a public sale at the Hattiesburg Stockyard or at the Lucedale Stockyard, whichever is more convenient and where the holding of the cattle can be arranged on the date of the sale. Your Executor should be given permission to secure the serves of a person or persons to load the cattle, haul them to the stockyard and sell them and be authorized to pay the fee for doing so. In fact, the court order should permit the stockyard to withhold the funds to pay for hauling of the cattle. The stockyard will send a truck and trailer to pick up the cattle and deliver them to the yard to be present at the sale and would withhold the transportation and loading costs out of the proceeds of the sale. Your Plaintiff shows the quarter horses that are left are very nice animals and, in fact, all but one (1) was registered and the papers have been taken by another party, thought to be Luther Ladner. Luther Ladner went on the property of the decedent, GARLAND LADNER, after his death and picked up five (5) horses, one (1) of which was delivered to CAMILLE MARTIN. Luther Ladner should be required to return the horses. Luther Ladner took the cattle trailer and all the saddles, bridles, blankets, etc. that belonged with the horses. All this property belonged to the decedent, GARLAND LADNER. In addition to this, Luther Ladner took the big screen television and the VCR and these items should be returned to your Plaintiff so that he can make disposition of same in accordance with this Court’s order.
* * *
... The Court should enter an order directing the Sheriff of Pearl River County or one of his deputies or a constable to marshal these assets so they can be disposed of as directed by the Court.
*1058 ¶ 26. On the same day, the trial court entered a Judgment Appointing Executor which appointed Fred as the Executor and provided in pertinent part:
The Court finds further that the Complaint stated that certain parties had taken personal property that belong to the estate and that FRED LADNER is authorized to request that the personal property be returned to him as Executor to be disposed of in accordance with the order of this Court. The Court finds that the parties failing to do so, then, FRED LADNER is authorized to file appropriate pleadings in this Court to request the Court to hear and determine who is the true and legal owner of the personal property.
The Executor is further authorized to bring any and all action necessary to secure possession and try ownership of any and all property belonging to the decedent’s estate.
The Court finds further that FRED LADNER be and is hereby authorized to dispose of the cattle and horses that were left by the decedent since the decedent had only a few acres of land and was using the property of his brother, LUTHER LADNER, at the time of his death to run his cattle on and that there is no person that is in a position to care for the animals. The Court finds that the Executor should take the cows to either Hattiesburg Stockyard or Luce-dale Stockyard for sale and is authorized to retain the services of the stockyard to have people come pick up the cattle, haul them to the yard and the yard will deduct the charges incurred for their services from the sale price of the cattle and the remaining funds should be paid to FRED LADNER as Executor of the estate of his deceased brother, GARLAND LADNER. The Court finds the Executor may sell said horses at the public auction either at either of the stockyards or at the horse sale in Mize, MS or any other public horse sale wherein the prices of the animals will be value of the animals at public sale. The Court finds that out of the proceeds, the Executor or the yard will withhold the commissions for performing these services and the remainder will be placed into the estate to be divided upon conclusion of the estate.
[[Image here]]
IT IS FURTHER ORDERED that the Sheriff assist the Executor or his designees in securing the cattle and/or horses off the land of Luther Ladner, if needed, so the cattle and horses may be penned, picked up and sold as herein-above set out. The Sheriff or Deputy or Deputies shall render assistance in keeping the peace while the cattle and horses are gathered and penned even though the animals are on the land of Luther Ladner or anyone else. The Sheriff and his officers are directed to keep the peace.
(emphasis added).
¶ 27. On April 21, 2002, accompanied by law enforcement, Fred went to Luther’s property to take possession of the livestock. Luther did not consent. This resulted in an altercation which led to Luther’s arrest.
¶28. The next day, Luther’s attorney wrote letters to the stockyards, informing them of the dispute, and warning them not to dispose of the livestock. A copy of the letters were sent to the chancellor, the court clerk and Fred’s attorney.
¶ 29. That same day, the chancellor held a hearing on the matter, and ordered Fred not to dispose of the livestock until further order of the Court. The matter *1059 was set for trial on June 19, 2002.[4]
¶ 30. Following the trial, the chancellor rendered his Findings of Fact and Conclusions of Law, wherein he purported[5] to address the “issue of whether the Judgment of the Court exceeded its legal authority in granting Fred Ladner the power to take possession and dispose of the cattle and horses in a way that is inconsistent and inimical to the law.”
¶ 31. The trial court concluded that Luther had valid title to the horses, but not the cattle or other items claimed by Luther. The trial court then addressed whether Fred and his attorney, Jack Parsons violated the Litigation Accountability Act and Rule 11:
The fact that Luther Ladner did not own the cattle does not shield Fred Lad-ner, Executor, and his attorney, Jack Parsons, from the consequences of their actions. The fact remains that Fred Ladner, Executor, and his attorney, Jack Parsons, employed the strong arm of this Court to wrest control of cattle and horses off the land of Luther Lad-ner, which also precipitated Luther Lad-ner’s arrest by law enforcement. This was all done without a legal foundation and in violation of the Litigation Accountability Act and Rule 11.
[[Image here]]
Fred Ladner, Executor, and his attorney, Jack Parsons, had less drastic measures available. They could have gotten an emergency temporary restraining order preventing Luther Ladner from disposing of the cattle and horses, and set a hearing before the court on the issue of ownership. But not only did their actions give no notice to Luther Ladner, they confiscated Luther Ladner’s property, prevented Luther Ladner from having his day in court and precipitated his arrest. Further, the process was even more abusive because the initial complaint did not support the Court’s Judgment of April 16, 2002. For these reasons, court proceedings were wrongly used by Fred Ladner, Executor, and his attorney, Jack Parsons, to deny Luther Ladner his legal rights and the confiscation of his property.
¶ 32. The trial court was correct, I believe, in that the initial complaint did not support the Court’s Judgment of April 16, 2002. However, it is harsh and unfair to shift the entire blame to Fred and his attorney. This is especially so, I think, since we are given no explanation of why the chancellor entered the order to begin with. The only misrepresentation we are told about is that Fred and his attorney “knew or had reason to know of Luther Ladner’s claim of possession and ownership.” The chancellor further states that Fred and his attorney had “less drastic measures” available to them.
*1060 ¶ 33. The record before us indicates nothing beyond the contents of the Complaint was presented to the chancellor when he signed the order allowing Fred, accompanied by the “Sheriff or Deputy or Deputies” to enter Luther’s property and take the livestock. That being the case, it seems to me we should be asking why the chancellor signed the order, not why Fred and his attorney asked for it. The Complaint clearly falls far short of compliance with the requirements for a temporary restraining order, or order of seizure, without notice to Luther. Again, I am persuaded that we should be asking why the order was signed, rather than why it was requested.
¶ 34. If the chancellor is claiming he has a reasonable basis to assert that Fred and his attorney intentionally and willfully lied to the court, I find nothing in the record to substantiate such a claim.
¶ 35. The charge against Fred and his attorney I find most tenuous, is the chancellor’s statement that “the process was even more abusive because the initial complaint did not support the Court’s Judgment of April 16, 2002.” If the chancellor signed an order which was not justified by the complaint, it seems we should be looking to the one who signed the unsupported order.
¶ 36. Furthermore, rebutting the chancellor’s assertion that the court was not informed of the dispute, or Luther’s claim of ownership, I find the following in the complaint:
1.“... the court should direct that Luther Ladner release the animals to the Executor.... ”
2. “Luther Ladner went on the property of the decedent, Garland Ladner, after his death, and picked up five (5) horses.... ”
3. “Luther Ladner should be required to return the horses.”
4. Plaintiff prays “... this Court ... direct that he proceed to ... require people that are in custody of this property summoned to appear at a date certain for a hearing on said ownership of said property.”
Additionally, the following is found in the chancellor’s order:
1. “The Court finds further that the Complaint stated that certain parties had taken personal property that belong to the estate.... ”
2. “The plaintiff has attached to the Complaint a list of personal property that was thought to be owned[6] by the decedent and is authorized to take whatever actions necessary to secure said property ....” (emphasis added).
3. “The Sheriff or Deputy or Deputies shall render assistance in keeping the peace[7] while the cattle and horses are gathered and penned, even though the animals are on the land of Luther Ladner or anyone else. The Sheriff and his officers are directed to keep the peace.”
¶ 37. In light of these statements, I see little to justify sanctions against Fred or his attorney, or to justify his removal as executor, based upon misconduct. Conversely, I see much to indicate that the chancellor should not have signed the order without notice to Luther, and a hearing. Therefore, on the issues of violation *1061 of the Litigation Accountability Act, Rule 11 sanctions, and I would reverse and render the chancellor’s judgment. Accordingly, I respectfully concur in part and dissent in part.

. Subsequent to Fred taking possession of the livestock and the hearing on April 22, 2002, he filed another complaint on April 26, 2002 which paragraph IV stated:
Your Plaintiff shows that on or about April 16, 2002, LUTHER LADNER, told the attorney for the estate, JACK PARSONS, that he would shoot anyone that went upon the property to get the cows and horses that belonged to GARLAND LADNER and that the animals are on his property under lock and key. Your Plaintiff firmly believes that LUTHER LADNER is so deranged and so possesses with ownership of the animals that was left by his late brother, GARLAND LADNER, that he would, in fact, shoot anyone that would attempt to go onto the property to secure the animals.
The complaint prayed that the matter be set for a hearing to determine the ownership of the animals.

. Although the chancellor specifically stated the issue he intended to address, he never made a finding of whether the court exceeded its authority.

. For reasons unexplained, the chancellor’s Judgment then proceeded to grant Fred the authority to take possession of, and dispose of, this personal property "thought to be owned by” the decedent.

. Why would the Sheriff need to "keep the peace” if there were not conflicting (and hostile) claims to the property?